FILED
COURT OF APPEALS
DIVISION II

2015 FEB -3 AM 8: 53

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44789-4-II |
| Appellant, | |
| v. | |
| BRYAN ANAYA-DEGANTE, | |
| Respondent. | |
| STATE OF WASHINGTON, | Consolidated with No. 44792-4-II |
| Appellant, | |
| v. | |
| WILIBALDO HERRERA-IBARRA, | UNPUBLISHED OPINION |
| Respondent. | |

SUTTON, J. – In this consolidated appeal, the State of Washington appeals the superior court's order granting Bryan Anaya-Degante and Wilibaldo Herrera-Ibarra's motions to suppress the evidence against them and the superior court's orders dismissing the charges. The State challenges one of the superior court's findings of fact[1] and its conclusions of law that the officers did not have reasonable articulable suspicion of criminal activity that justified the initial detentions. We hold that substantial evidence supports the challenged finding of fact and that the

---

[1] Although the State assigns error to several findings of fact, its argument addresses only one finding. Because the State has not presented any argument related to the other findings to which it assigns error, we will not consider the additional assignments of error. RAP 10.3(a)(6).

findings support the superior court's conclusion that the initial detentions were not justified. Accordingly, we affirm.

FACTS

I. BACKGROUND

On the evening of January 2, 2013, officers from the Clark-Vancouver Regional Drug Task Force served a search warrant on Dhena Albert's apartment. The search warrant authorized the officers to search the apartment for methamphetamine, items related to the distribution and packaging of methamphetamine; and various records, including records that would reveal "the identity of co-conspirators and suppliers." Clerk's Papers (Herrera-Ibarra) (CP(H)) at 19. The search warrant did not identify any of the possible "co-conspirators or suppliers"[2] by name or provide any descriptions.

The officers serving the search warrant had information that there was a "possibil[ity]" that a Hispanic male could arrive at Ms. Albert's apartment to deliver or purchase methamphetamine that evening and that Albert's Hispanic boyfriend might be present in violation of a no contact order. Verbatim Report of Proceeding (VRP) (Feb. 28, 2013) at 22. They were also aware that other Hispanic males had frequented the apartment to purchase and sell drugs during the investigation, but they had no information identifying who these people were.

The officers executing the search warrant stationed an officer outside to warn them if anyone approached the apartment. This officer advised the officers in the apartment that two Hispanic men were approaching the apartment. Although the officer did not identify them at the time, these men were Anaya-Degante and Herrera-Ibarra.

---

[2] CP(H) at 19.

2

Anaya-Degante knocked on the apartment door. When City of Vancouver Police Sergeant Pat Moore opened the door, Anaya-Degante threw up his hands and appeared surprised to see the officers. Clark County Sheriff's Detective Robert Latter immediately detained Anaya-Degante to determine why he was at the apartment. When the officers searched Anaya-Degante, they found two glass pipes that they identified as methamphetamine pipes; there was methamphetamine in the pipes. When Anaya-Degante knocked on the door, Herrera-Ibarra was behind Anaya-Degante on the stairs. When Herrera-Ibarra saw Sergeant Moore, he immediately turned and started to walk away; one of the officers followed Herrera-Ibarra and told him to stop. Herrera-Ibarra did not comply with the officer's order to stop, but the officer caught up with him and ordered him to show his hands. Herrera-Ibarra eventually complied and when the officer searched him he found bags of methamphetamine on Herrera-Ibarra's person.

## II. SUPPRESSION MOTION

The State charged Anaya-Degante with possession of a controlled substance-methamphetamine[3] (count 3), and charged Wilibaldo Herrera-Ibarra with possession of a controlled substance with intent to deliver-methamphetamine[4] (count 4).[5] Anaya-Degante and Herrera-Ibarra challenged their warrantless initial detentions.

---

[3] RCW 69.50.4013(1).

[4] RCW 69.50.401(1), (2)(b).

[5] The State also charged Albert with various drug offenses (counts I and II); Albert is not part of this appeal.

At the suppression hearing, Vancouver Police Department Detective Shane Hall, Detective Latter, and Sergeant Moore testified about executing the search warrant and detaining Anaya-Degante and Herrera-Ibarra.[6] Neither of the defendants presented any witnesses.

Following the hearing, and without making an oral ruling from the bench, the superior court issued a written "Decision of the Court" and ordered the parties to present written findings of fact and conclusions of law.[7] CP(H) at 61. This written decision described the execution of the search warrant and Anaya-Degante and Herrera-Ibarra's initial detentions.[8] The decision also stated that at the time of the initial detentions, the officers had no information specifically identifying Anaya-Degante or Herrera-Ibarra as suspects and that the officers knew only that (1) Albert's Hispanic ex-boyfriend might be in or arriving at the apartment in violation of a no contact order, and (2), based on information obtained during the investigation that led to the warrant, Hispanic males bought and sold controlled substances in Albert's apartment. Specifically, the superior court stated:

> *Detective [Sergeant] Moore testified that any Hispanic males who showed up at the apartment while they were executing the warrant were going to be considered suspicious.* Detective [Sergeant] Moore immediately detained defendant Anaya-Degante after he knocked on the door. Detective [Sergeant] Moore also indicated he was going to detain the person walking down the steps. Even though he did not know the person was associated with the apartment being searched, the bases for the detention was the information provided to them during the course of their investigation and the fact that they arrived at the apartment during the execution of the warrant.

---

[6] We describe the relevant portions of this testimony in more detail below.

[7] This written decision related to all three superior court cause numbers and all three defendants.

[8] The written findings of fact entered under Herrera-Ibarra's cause number and described below were essentially the same. To avoid repetition, we have summarized the written decision.

No. 44789-4-II (consolidated with No. 44792-4-II)

CP at 63-64 (emphasis added). The remaining factual findings were substantially similar to those in the written findings of fact entered under Herrera-Ibarra's superior court cause number.

The trial court concluded that under *State v Broadnax*, 98 Wn.2d 289, 654 P.2d 96 (1982), *overruled on other grounds by Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993), and *State v Gatewood*, 163 Wn.2d 534, 182 P.2d 426 (2008), the initial detentions were improper because the officers lacked individualized suspicion. The trial court then ordered the prevailing parties to prepare and present written findings of fact and conclusions of law consistent with the written decision. After the superior court issued its written decision, the State moved to dismiss the charges against Anaya-Degante and Herrera-Ibarra without prejudice. The superior court granted the motion.[9]

Herrera-Ibarra later presented written findings of fact and conclusions of law to the superior court.[10] In addition to setting out the facts described above, the superior court found:

> 7.      *Detective [Sergeant] Moore testified that any Hispanic males who showed up at the apartment while they were executing the warrant were going to be considered suspicious.* Detective [Sergeant] Moore immediately detained defendant Anaya-Degante after he knocked on the door.
>
> 8.      Detective [Sergeant] Moore also indicated he was going to detain the person walking down the steps. Even though he did not know the person was associated with the apartment being searched, the basis for the detention was the information provided to them during the course of their investigation and the fact that they arrived at the apartment during the execution of the warrant.

CP(H) (Findings of Fact (FF) 7, 8) at 73 (emphasis added).

---

[9] A second judge signed the orders dismissing the charges.

[10] Anaya-Degante did not present the superior court any written findings of fact or conclusions of law. And the findings of fact and conclusions of law entered in Herrera-Ibarra's case do not refer to Anaya-Degante or Anaya-Degante's superior court cause number.

5

No. 44789-4-II (consolidated with No. 44792-4-II)

In regard to the suppression motion, the superior court made the following conclusions of law:

1. The facts clearly demonstrate that the officers were going to detain any Hispanic male who arrived at the residence while they were executing the search warrant.

2. The officers pre-determined that no individualized suspicion or probable cause was going to be needed for them to detain anybody who arrived at the residence.

3. Herrera-Ibarra's action by turning and walking down the steps does not justify his arrest or detention.

4. Therefore, the motion to suppress based on the warrantless search is granted. All evidence obtained as a result of the warrantless search of Mr. Herrera-Ibarra should be suppressed.

CP(H) (Conclusions of Law (CL) (b) 1-4)) at 74 (emphasis added).

The State appeals.

ANALYSIS

The State challenges the superior court's decision and order granting Anaya-Degante and Herrera-Ibarra's motions to suppress. It argues that the superior court erred in finding that "[*Sergeant*] Moore testified that he would seize any Hispanic person without individualized suspicion due to that person's ethnicity"[11] and in concluding that the officers lacked reasonable, articulable suspicion to initially detain Anaya-Degante and Herrera-Ibarra. We disagree.

I. STANDARD OF REVIEW

We review the superior court's decision on a motion to suppress by considering whether substantial evidence supports the challenged findings and whether those findings support the

_____

[11] Br. of Appellant at 20 n.5.

superior court's conclusions of law. *State v. Ross*, 106 Wn. App. 876, 880, 26 P.3d 298 (2001), *review denied*, 145 Wn.2d 1016 (2002). Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the finding. *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). We consider unchallenged findings as verities on appeal. *Ross*, 106 Wn. App. at 880.

## II. FINDINGS OF FACT

The State argues that the superior court's finding that "Sgt. Moore testified that he would seize any Hispanic person without individualized suspicion due to that person's ethnicity," is not supported by substantial evidence.[12] Br. of Appellant at 20 n.5. We disagree.

Moore testified that he decided to detain Anaya-Degante and Herrera-Ibarra based on the "totality of the circumstances," which included his knowledge that (1) a Hispanic male may have been living in Albert's apartment in violation of a restraining order, (2) Hispanic males frequented Albert's apartment, (3) Albert's suppliers were Hispanic males, and (4) there was a possibility that the suppliers would arrive at the apartment during the search. VRP (Feb. 28, 2014) at 78. Specifically, when the State asked Moore at what point he had decided to "have contact with" Herrera-Ibarra, Moore testified the officers had decided to "stop and detain and at least identify those individuals to see if they were potentially involved in a crime" because (1) the officers had

---

[12] Although the superior court did not enter written findings of fact and conclusions of law in Anaya-Degante's case, the superior court's written decision is sufficient to allow review. *State v. Smith*, 76 Wn. App. 9, 16, 882 P.2d 190 (1994) ("A court's failure to enter written findings of fact and conclusions of law following a suppression hearing as required by CrR 3.6 is harmless error if the court's oral opinion and the record of the hearing are 'so clear and comprehensive that written findings would be a mere formality.'") (quoting *State v. Smith*, 68 Wn. App. 201, 208, 842 P.2d 494 (1992)); *see also State v. Head*, 136 Wn.2d 619, 622, 964 P.2d 1187 (1998) (trial court's written memorandum opinion is equivalent of a trial court's oral expression of its informal opinion).

probable cause to search the apartment for narcotics, (2) they had conducted one or two controlled buys at the apartment, (3) they had seen "other Hispanic males come and go from" the apartment, (4) they had information from informants that "other Hispanic males frequent[ed]" the apartment, and (5) they had found narcotics and "other evidence" when they searched the apartment. VRP (Feb. 28, 2013) at 62, 63.

In addition, when the State asked Moore what safety concerns he had upon Herrera-Ibarra's arrival, Moore testified that, based on his experience with the drug unit, in the majority of drug operations there are firearms involved, "[s]o anybody who shows up at a search warrant is gonna be highly suspicious" and the officers would want to know why that person was there. VRP (Feb. 28, 2013) at 67. He further stated:

> And, again, the information we had ahead of time was we knew this—the particular defendant who was renting the apartment where we had a search warrant for, I mean, we knew who she was assoc—we didn't have particular names, but we knew she was associated with other Hispanic males who frequent her residence, so with all that, we stopped and detained the—the two individuals that arrived.

VRP (Feb. 28, 2013) at 67-68.

Moore admitted, however, that although the officers knew that Albert's boyfriend might be living in the apartment and that Albert's suppliers might be Hispanic males, the officers did not have descriptions of Albert's boyfriend or the Hispanic males who were potentially Albert's drug suppliers nor did the officers have the suppliers' names. He also admitted that the officers had merely observed unidentified Hispanic males coming and going from the apartment during the controlled buys.

8

Additionally, Moore testified, "[Anaya-Degante] was detained from the moment he knocked on the door and I answered the door. . . . *My sole purpose was to detain him.*" VRP (Feb. 28, 2013) at 78. Moore then stated,

> Based on the totality of the circumstances, the time and the knowledge and the training and experience I had at the time, based on [*Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], I believed a crime has been committed, was about to be committed, and that's why I detained him.
> *And the mind-set was, I was already going to detain the individual knocking at the door and the individual walking down the stairs.* Okay?
> I know the facts of the case of [*Terry v. Ohio*], and at that time I felt we had articulable, reasonable suspicion and evidence and facts leading up to that to allow me, a police officer, to stop, detain and [identify] the two individuals that arrived at that apartment.

VRP (Feb. 28, 2013) at 79 (emphasis added). When Anaya-Degante's counsel asked Moore if he believed he could detain the defendants because they were Hispanic, Moore responded, "That's— that's part of the facts. Hispanic males that we know frequent the apartment." VRP (Feb. 28, 2013) at 80. Moore admitted, however, that there was no "documentation" that Anaya-Degante was among the men who frequented the apartment, but he asserted, "But I think I have a right to detain and to find out and [identify] who that individual is and why he is coming to that apartment based on what I've already testified to." VRP (Feb. 28, 2014) at 80. Moore also admitted that Anaya-Degante was not near any money or drugs when he arrived at the apartment.

Furthermore, when Anaya-Degante's counsel asked Moore if he had any personal knowledge that Anaya-Degante was involved in any criminal activity at the time of the detention, Moore responded, "I didn't know that. He arrived at the apartment. That's why I detained him." VRP (Feb. 29, 2013) at 82. He also admitted that when he stopped Herrera-Ibarra, he did not know who Herrera-Ibarra was.

Although Moore asserted that the detentions were based on the circumstances as a whole, his testimony described above clearly demonstrates that the key circumstance was that the defendants were Hispanic men who approached Albert's apartment. These facts, taken as a whole, support the superior court's finding that Moore would have detained any Hispanic male would who arrived at the apartment during the search without any individualized suspicion. Accordingly, this argument fails.

### III. CONCLUSIONS OF LAW

The State next asserts that the totality of the evidence established that the officers' initial detentions[13] of Anaya-Degante and Herrera-Ibarra were "reasonable and based on articulable facts individually applied to Anaya-Degante and Herrera-Ibarra,"[14] and did not amount to "racial profiling." Br. of Appellant at 20 n.5. Essentially, the State argues that the officers had reasonable suspicion because Anaya-Degante and Herrera-Ibarra "fit the description of the drug suppliers who were expected to arrive at the apartment during the time period when they did" and the apartment was a known drug area. Br. of Appellant at 20. This argument fails.

### A. Reasonable Suspicion Standards

To avoid violating the Fourth Amendment[15] guarantee against unreasonable searches and seizures, the State bears the burden of showing that a warrantless seizure fits one of a few limited and jealously guarded exceptions to the warrant requirement. *State v. Williams*, 102 Wn.2d 733,

---

[13] Although neither party discusses at what point the actual detentions occurred, the parties appear to assume that Anaya-Degante was detained immediately after Moore opened the door and that Herrera-Ibarra was detained when he started to walk down the stairs and was ordered to stop.

[14] Br. of Appellant at 21.

[15] U.S. CONST. amend. IV.

10

736, 689 P.2d 1065 (1984). The detention or search of someone other than an occupant during a valid search of a residence may be justified by what the courts have referred to as "'presence plus'"—the presence of independent factors "tying *the person* to illegal activities being investigated or raising a reasonable suspicion that the person is armed and dangerous." *State v. Smith*, 145 Wn. App. 268, 276, 187 P.3d 768 (2008) (emphasis added) (citing *Broadnax*, 98 Wn.2d at 300-301). "The 'plus' consists of independent factors, *other than arrival at the scene*, tying the person to the illegal activities being investigated or raising a reasonable suspicion." *Smith*, 145 Wn. App. at 276 (emphasis added).

### B. No Individualized Reasonable Suspicion

We agree with the superior court that the facts here do not establish the necessary reasonable, individualized suspicion. Although the officers had knowledge that Hispanic men were connected to the illegal activities taking place in Albert's apartment and might arrive during the search and that Albert's Hispanic boyfriend might be present in violation of a restraining order, the only factors tying Anaya-Degante or Herrera-Ibarra to any illegal activity were their presence at the apartment, their race and gender, their apparent surprise at encountering the officers, and Herrera-Ibarra's attempt to walk away. That is clearly insufficient to establish *individualized* suspicion.

The State contends that this case is similar to *State v. Pressley*, 64 Wn. App. 591, 825 P.2d 749 (1992). We disagree. Unlike here, the officers in *Pressley* had observed the defendant personally engaging in what appeared to be criminal activity before detaining her. *Pressley*, 64 Wn. App. at 593-94. The *Pressley* court did not hold that the defendant's mere presence in a high crime area, her apparent surprise when she noticed the officers, or her attempt to walk away from

11

the officers was sufficient to justify the detention. *Pressley*, 64 Wn. App. at 594. Thus, *Pressley* is not helpful to the State.

The State further contends that the trial court erred when it relied on *Gatewood*. Again, we disagree.

In *Gatewood*, officers observed Gatewood appear to be surprised and turn his body as if he was trying to hide something after he noticed the officers driving by the bus shelter he was in. *Gatewood*, 163 Wn.2d at 537. Suspicious that Gatewood was trying to hide something, the officers circled back and saw Gatewood walking away. *Gatewood*, 163 Wn.2d at 537-38. They then saw Gatewood jaywalk to the other side of the street, start walking the opposite direction, and turn onto a cross street. *Gatewood*, 163 Wn.2d at 538. The officers drove slowly behind Gatewood and then pulled in front of him, blocking his path. *Gatewood*, 163 Wn.2d at 538. One of the officers got out of the patrol car and told Gatewood to stop because they wanted to talk to him. *Gatewood*, 163 Wn.2d at 538. Gatewood continued to walk away despite the officers ordering him to stop. *Gatewood*, 163 Wn.2d at 538. On appeal, the State conceded that the officers had seized Gatewood when they first blocked his path and told him to stop. *Gatewood*, 163 Wn.2d at 540.

Our Supreme Court held that this initial seizure was unlawful because the officers lacked "specific, articulable facts indicating criminal activity." *Gatewood*, 163 Wn.2d at 541. Our Supreme Court further held that "[s]tartled reactions to seeing the police do not amount to reasonable suspicion" and that, although flight from police may contribute to a finding of reasonable suspicion of criminal activity, the State had not shown that Gatewood had fled from the police because the officers had testified that they were unsure whether Gatewood had seen the patrol car returning when he left the bus shelter and Gatewood was not walking very fast.

12

*Gatewood*, 163 Wn.2d at 540. The court concluded that the officers had "seized Gatewood to conduct a speculative criminal investigation." *Gatewood*, 163 Wn.2d at 542.

In this case, the State argues that the officers here "had far more facts to base their suspicions upon" than was the case in *Gatewood* and that "[the officers] did not engage in a speculative criminal investigation." Br. of Appellant at 22 (quotation omitted). Although the State is correct that the officers had information establishing that there were drug related activities taking place in Albert's apartment and that some unidentified Hispanic men were involved, those additional facts are not sufficient to justify the detentions here. The officers still had no *individualized* suspicion that Anaya-Degante or Herrera-Ibarra were involved in any drug activity. And, under *Gatewood*, mere surprise at encountering the officers does not amount to reasonable suspicion. *Gatewood*, 163 Wn.2d at 540.

As to Herrera-Ibarra's walking away, although *Gatewood* states that flight may contribute to a finding of reasonable suspicion of criminal activity, here, as in *Gatewood*, Herrera-Ibarra's turning around and walking away from the officers was not dispositive. Furthermore, there was evidence that the detentions were to allow for a speculative investigation—Moore testified specifically that "the decision was made to stop and detain [Hispanic males arriving at the apartment] *to see if they were potentially involved in a crime.*" VRP (Feb. 28, 2013) at 63 (emphasis added).

Finally, the State contends that the superior court's reliance on *Broadnax* was misplaced, arguing that the evidence showed that Anaya-Degante and Herrera-Ibarra met the individualized suspicion requirement established in *Broadnax*. *Braodnax*, 98 Wn.2d at 295-96 (citing *Ybarra v. Illinois*, 444 U.S. 85, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979)). Again, as we discuss above, the

No. 44789-4-II (consolidated with No. 44792-4-II)

superior court's findings do not suggest that the officers had reasonable suspicion that Anaya-Degante or Herrera-Ibarra were personally involved in criminal activity. The State did not present any evidence connecting Anaya-Degante or Herrera-Ibarra to any illegal activity beyond their presence at the apartment, their gender and race, their apparent surprise at encountering the officers, and Herrera-Ibarra's attempt to walk away from the officers, and we hold that this is insufficient to establish individualized suspicion.

Accordingly, the superior court did not err when it granted the suppression motions and dismissed the charges. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Sutton, J.

We concur:

Johanson, C.J.

Maxa, J.

14