IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77321-6-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RODNEY EUGENE MANS, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 11, 2019 |
| | ) | |

ANDRUS, J. — Rodney Mans was convicted of unlawful possession of methamphetamine. He challenges the legality of a Terry[1] stop and the admission of evidence of methamphetamine found in his pocket. We conclude the police lacked a well-founded suspicion that Mans was engaged in criminal conduct when they initially detained him. We reverse his conviction and remand for a new trial.

## FACTS

On August 30, 2016, Deputy Thomas Simone and Detective Coulson Young, both with the King County Sheriff's Office, were patrolling in a marked police car in unincorporated King County. They saw Mans on foot from about a

---

[1] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

block away. He was carrying a red cigarette carton in one hand and a small white "bindle" in the other.[2]

When Mans saw the police vehicle, he looked shocked, paused and then tossed the bindle away. At that point, Deputy Simone, whose driver side window was down, yelled out, "Police, stop." Mans paused "for a split second" and then began to run in the opposite direction. Deputy Simone followed him on foot. Within 10 seconds, Mans stopped running, laid down on the ground, and placed his hands on his head. While Deputy Simone was placing Mans in handcuffs, Detective Young picked up the bindle Mans dropped and saw a crystal-like substance inside. Although the record is unclear, Detective Young testified he walked back toward the patrol car where Deputy Simone was already searching Mans "incident to arrest." Deputy Simone's testimony suggests he did not begin the search until Detective Young showed him the suspected methamphetamine.

Deputy Simone testified he initially ordered Mans to stop because he had observed Mans littering. He testified he chased after Mans and arrested him because Mans did not listen to his order to stop and was obstructing his investigation into littering by running away. Deputy Simone testified he did not stop Mans because he was walking near a known drug house.

Detective Young testified when he saw the white bindle in Mans' hand, he suspected it was narcotics. He stated they stopped Mans because he was close to a known drug house, and Mans' look of shock at seeing the police, along with his actions of dropping the bindle and running away, were "suspicious." Detective

---

[2] Detective Young described a "bindle" as a tissue or paper towel twisted into a little ball to hold something inside it.

Young testified that when Deputy Simone initially ordered Mans to stop, the officers had no particular crime in mind.

Once Detective Young saw the contents of the bindle, they arrested Mans for possession of methamphetamine. In their search of his person, they found more methamphetamine in one of Mans' pockets.

Mans was charged with one count of violating the Uniform Controlled Substances Act, Chapter 69.50 RCW, possession of methamphetamine. Lab tests later showed the white bindle contained 0.1 grams and the packet in Mans' pocket contained 1.1 grams of methamphetamine.

Mans moved to suppress the evidence of methamphetamine found in his pocket.[3] Mans argued that the Terry stop for littering was a pretext and, as Detective Young admitted, the officers actually suspected Mans was engaged in drug activity. Thus, he maintained there was an insufficient basis for a Terry stop.

The trial court denied Mans' motion to suppress in an oral ruling:

> The two officers who testified here last week testified that the sequence of the events was as follows: That the officer, arresting officer saw Mr. Mans on the street. It does not appear to have been anywhere near a known drug house, but at first it was alleged it was [a] couple houses away, but it turns out it was almost six blocks away that the officer[s] conceded.
>
> But regardless of that, when Mr. Mans saw the marked patrol car and officers in the car, he looked surprised and then he threw down a piece of . . . [a]n item that he had in his hand onto the ground. I think it was wrapped in paper towel – a bindle I think it was referred to. And then . . . after that, he started to run or move very quickly, and it was at that time that the officers yelled stop and Mr. Mans did

---

[3] Mans did not seek to suppress the methamphetamine in the bindle. Mans represented to the trial court that there was no basis to seek suppression of that evidence because it was abandoned before the police detained Mans. Nor did Mans seek dismissal of the charge based on an illegal arrest.

not stop and ultimately was cornered some feet away from that incident.

Based on that, I do find that the . . . officers did have sufficient basis to stop and . . . the subsequent search after the . . . stop was legal, and therefore, the drugs will come in.

The trial court compared the facts in State v. Gatewood, 163 Wn.2d 534, 182 P.3d 426 (2008) and State v. Graham, 130 Wn.2d 711, 927 P.2d 227 (1996), and found Mans' circumstances more analogous to Graham, in which the Terry stop was found lawful. The court then stated:

[T]here was some heavy emphasis put on the nature of the neighborhood and the location of the known drug house, . . . which turned out to be untrue; however, even if you exclude that aspect of the case, . . . I think the officer still has sufficient basis.

Now, the deer-in-the-headlights look alone is not going to be sufficient to [justify] the Terry stop, but as the State pointed out in this case, given the totality of the circumstances: The deliberate discarding [of] the bindle onto the ground combined with the deer-in-the-headlights look and − most importantly, and he ran from the officers, those three factors combined does appear to me did provide the State a sufficient basis to make the stop . . . .

At trial, the court instructed the jury that, because the State alleged Mans had possessed methamphetamine on multiple occasions, the State had to prove one act of possession beyond a reasonable doubt, and the jury had to unanimously agree as to which act had been proved.[4] The jury found Mans guilty. Mans appeals.[5]

---

[4] This instruction was identified as a "Petrich instruction," based on State v. Petrich, 101 Wn.2d 566, 573, 683 P.2d 173 (1984) (when State alleges multiple acts, jury must be instructed that all jurors must agree that same underlying criminal act was proved beyond a reasonable doubt), overruled in part on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988).

[5] Mans was convicted of burglary in the first degree and two counts of felony violation of a no contact order, domestic violence in a 2016 case, Cause No. 16-1-08120-3. The court conducted his sentencing hearing in the 2016 case and this case simultaneously. Mans was sentenced to a total of 101 months in the 2016 case. In this case, Mans was sentenced to 12 months, to be served

## ANALYSIS

Mans raises two arguments on appeal. First, he argues the State's evidence at the pretrial CrR 3.6 evidentiary hearing did not support the trial court's finding that Mans ran from Deputy Simone before the deputy yelled at him to stop.[6] Second, he contends that without this piece of evidence, Mans' detention violated article 1, section 7 of the Washington State Constitution because there was an insufficient basis for concluding Mans was engaged in any criminal activity. We agree.

In reviewing the denial of a motion to suppress, we review the trial court's conclusions of law de novo and its findings of fact used to support those conclusions for substantial evidence. State v. Fuentes, 183 Wn.2d 149, 157, 352 P.3d 152 (2015).

## A. Trial Court Finding on When Mans Fled from the Police

There is no evidence to support a finding that Mans fled the officers before Deputy Simone ordered him to stop. Deputy Simone testified he saw Mans drop the little white bindle, he then ordered "Police, stop," and only after he made this statement did Mans begin to run. Detective Young's version of events is similar.

---

concurrently with his sentence in the 2016 case. Mans does not challenge his sentence in this appeal.

[6] The trial court instructed the State to prepare findings of fact based on its oral ruling, but there are no written findings of fact and conclusions of law as required by CrR 3.6(b). The failure to enter written findings of fact and conclusions of law following a suppression hearing is harmless error if the court's oral opinion and the record are "so clear and comprehensive that written findings would be a mere formality." State v. Smith, 68 Wn. App. 201, 208, 842 P.2d 494 (1992). Neither party challenges the adequacy of the oral ruling. We thus base our analysis on the court's oral findings.

He testified Deputy Simone yelled "Police" out the open driver's side window, after which Mans took off running.

The State does not dispute the officers' testimony. We therefore conclude the trial court's finding that Mans fled the police before Deputy Simone commanded him to stop is not supported by substantial evidence in the record.

## B. Legality of _Terry_ Stop

The State concedes the police seized Mans when Deputy Simone yelled for him to stop. This concession is justified under State v. O'Neill, 148 Wn.2d 564, 577-78, 62 P.3d 489 (2003) (police officer commanding a person to stop is a seizure) (quoting State v. Cormier, 100 Wn. App. 457, 460-61, 997 P.2d 950 (2000)). Our review of the constitutionality of Mans' seizure is de novo. State v. Rankin, 151 Wn.2d 689, 694, 92 P.3d 202 (2004).

Generally, under the Fourth Amendment to the United States Constitution and article I, section 7 of Washington's Constitution, an officer may not seize a person without a warrant. State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). But officers may, without a warrant, briefly detain a person for questioning if the officer has reasonable suspicion the person stopped is or is about to be engaged in criminal activity. Fuentes, 183 Wn. 2d at 158.

A valid Terry stop requires that the officer have reasonable suspicion of criminal activity based on specific, objective, and articulable facts known to the officer at the inception of the stop. Gatewood, 163 Wn.2d at 539. In evaluating the reasonableness of the officers' suspicion, the reviewing court looks at the totality of the circumstances known to the officers. Fuentes, 183 Wn.2d at 158.

The totality of circumstances includes the officers' training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty. State v. Acrey, 148 Wn.2d 738, 747, 64 P.3d 594 (2003). It is the State's burden to establish that a warrantless Terry stop is reasonable. State v. Cardenas-Muratalla, 179 Wn. App. 307, 309, 319 P.3d 811 (2014).

In this case, the location of the stop was not a factor one way or the other. Although the State initially argued the police were near a known drug house, the trial court found this was not true.

As for the purpose of the stop, the State argues the police were justified in seizing Mans because he was littering. We disagree. Littering is not a crime; rather, it is a class 3 civil infraction subject to a $50 fine. RCW 70.93.060(2)(a); RCW 7.80.120(1)(c). Terry stops are permissible only when there is reasonable suspicion of criminal activity; this exception to the warrant requirement does not apply to non-traffic civil infractions.[7] State v. Day, 161 Wn.2d 889, 897, 168 P.3d 1265 (2007); State v. Duncan, 146 Wn.2d 166, 174, 43 P.3d 513 (2002).

To the extent the State contends the police stopped Mans because he littered, we conclude that justification was a pretext for the actual reason they stopped him—to determine if the bindle he dropped contained drugs. Article I, section 7 forbids use of pretext as a justification for a warrantless seizure. State v. Ladson, 138 Wn. 2d 343, 353, 979 P.2d 833 (1999). A court determines whether

---

[7] Even if a police officer may detain an individual who has committed a civil infraction in his or her presence to identify the individual and to issue a civil citation, RCW 7.80.060, there is no evidence in this case that Deputy Simone's purpose in detaining Mans was to issue a littering citation. Deputy Simone testified he had never cited anyone for littering before.

a stop is pretextual by considering the totality of the circumstances. Id. at 358-59. In doing so, the court must consider "both the subjective intent of the officer as well as the objective reasonableness of the officer's behavior." Id. at 359.

Deputy Simone testified that the reason he stopped Mans was because he littered. But the more experienced officer, Detective Young, testified they suspected Mans was engaged in drug activity; he made no mention of littering. And it is objectively unreasonable to believe a police officer would chase an individual down the street because he saw the person throw a tissue to the ground. The trial court certainly did not find the police were justified in stopping Mans because he littered. The purpose of this stop was not to investigate littering. It was, as Detective Young testified, to investigate whether Mans possessed narcotics.

With regard to Mans' conduct, the trial court relied on the deer-in-the-headlights look Mans had on his face, the deliberate discarding of the bindle on the ground, and "most importantly," on the fact that Mans fled the officers. But Mans' act of fleeing cannot justify the seizure because, as indicated above, he did not run from the police until after he was commanded to stop.

The State argues that Mans' flight gave rise to a "further suspicion of obstruction." But when we review the merits of a Terry stop, we evaluate the circumstances at the time of the seizure, not events occurring thereafter. State v. Mendez, 137 Wn.2d 208, 224, 970 P.2d 722 (1999) (once individual is seized, subsequent events or circumstances cannot retroactively justify the seizure), abrogated on other grounds by, Brendlin v. California, 551 U.S. 249, 127 S. Ct.

2400, 168 L. Ed. 2d 132 (2007). And if the initial seizure was really for littering, an impermissible purpose for a Terry stop, then Mans' decision to run away did not obstruct Deputy Simone in investigating any crime.

We are left with two articulable facts regarding Mans' actions: his shocked look when he saw their patrol car and his dropping or tossing a small white bindle to the ground thereafter. The bindle looked familiar to Detective Young, who testified, in his experience, people use bindles to hold narcotics. But on cross-examination, he was explicitly asked if he had any reason to believe Mans was engaging in criminal activity, and he responded in the negative. He merely thought Mans' behavior "suspicious." Our Supreme Court has invalidated a Terry stop based on a "hunch" that a person was engaged in drug activity or on a feeling that "the entire circumstance was suspicious." Fuentes, 183 Wn.2d at 161. Thus, Detective Young's testimony undercuts the State's argument that the officers had "specific and articulable" facts warranting Mans' seizure.

Mans relies on State v. Gatewood, 163 Wn.2d 534, 182 P.3d 426 (2008), a case in which the Supreme Court found similar facts to be insufficient for a Terry stop. Before the police commanded Gatewood to stop, his eyes widened on seeing their patrol car, he twisted in a manner like he was trying to hide something, and he left a bus shelter and crossed the street midblock. Id. at 540. The Court stated "[s]tartled reactions to seeing the police do not amount to reasonable suspicion." Id. There was no evidence in Gatewood that police saw any illegal drugs, contraband, or firearms before they stopped the defendant.

The State relies on State v. Graham, 130 Wn.2d 711, 927 P.2d 227 (1996), to justify the stop. In Graham, uniformed officers, patrolling on bicycles an area known for a large volume of illegal drug transactions, saw the defendant carrying a wad of money in one hand and a small plastic baggie with white rocks, which officers suspected was cocaine, in the other hand. Id. at 714. When he saw the officers, he shoved his hands in his pockets and crossed the street against the light. Id. at 714-15. The Supreme Court upheld the warrantless seizure because the police could actually see inside the baggie Graham held in his hand. Id. at 725-26.

Neither Graham nor Gatewood is exactly analogous. In this case, unlike Gatewood, the police saw Mans toss away a white bindle, which they suspected might contain some type of drugs. But unlike Graham, they could not actually see inside the bindle and were not aware there were crystal-like rocks inside. Given the purpose of the stop was to investigate suspected drug activity, the police officers' inability to physically see any drugs makes this case more like Gatewood than Graham.

Finally, the amount of physical intrusion on Mans' liberty was significant. A police officer chased, handcuffed, and began searching Mans before Detective Young saw what was inside the bindle Mans dropped. Chasing and handcuffing an individual for littering and then fleeing police (if these were the true reasons for the stop) is obviously disproportionate to the claimed offenses.

Under the totality of circumstances test, we conclude the seizure was not a lawful Terry stop, and Mans' motion to suppress the methamphetamine found in

his pocket must be granted. Because the jury received a Petrich[8] instruction allowing it to convict based on either the methamphetamine found in the bindle or that found in his front pocket, we must reverse Mans' conviction and remand for further proceedings consistent with this opinion.

Reversed and remanded.

WE CONCUR:

Andrus, J.

Mann, A.C.J.

---

[8] State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984).